# EXHIBIT 1

# FEDERAL MEDIATION AND CONCILIATION SERVICE

| | |
|---|---|
| IN THE MATTER OF ARBITRATION ) | |
| ) | |
| ) | |
| KENTUCKY POWER COMPANY - ) | |
| MITCHELL PLANT ) | |
| ) | |
| ) | |
| and ) | Case 22-01521 |
| ) | |
| ) | |
| LOCAL 492 UTILITY WORKERS UNION OF ) | |
| AMERICA AFL-CIO ) | |

Thomas Dawson, Esq., for the Employer
David Radtke, Esq., for the Union
Before Matthew M. Franckiewicz, Arbitrator

## OPINION AND AWARD

This arbitration proceeding involves the Company's use of employees of a related Company to perform work at the Mitchell Plant.

A hearing was held on June 27, 2022 at Wheeling, West Virginia. Both parties examined and cross examined witnesses, and provided documentary evidence. Both parties filed briefs. The record closed with the exchange of briefs on August 15, 2022.

## Contract Provisions Involved

ARTICLE 2
UNION RECOGNITION

Section 1. Bargaining Unit Definition

The Company hereby recognizes the Union as the exclusive bargaining representative for all the physical employees of the Mitchell Plant in accordance with the provisions of the Labor-Management Relations Act of 1947, as amended. The term "employee" or "employees" as herein used and hereinafter appearing in this Agreement includes only those employees now or hereafter employed by the Company in the following job classifications:

All production and maintenance employees, including performance and custodian employees at the Company's Mitchell Power Plant located in Cresap, West Virginia; excluding office clerical employees and guards, professional employees, supervisors as defined in the Act, as amended, and all other employees, it being understood that the inclusions and exclusions as noted above are from a Certification issued by the National Labor Relations Board in Case No. 6-RC-5651 under date of May 14, 1971, for the Ohio Power Company, Mitchell Plant.

Section 2.  Classes of Employees

For the purpose of this Agreement, "classes of employees" are defined as follows:

(a)     Regular employees are those employees filling a regular job and who have served the prescribed probationary period of six (6) months.

(b)     Probationary employees are those employees hired to fill a full-time regular job, but who have not served the prescribed probationary period of six (6) months.

(c)     Temporary employees are those employees hired for full-time employment for a temporary period (not normally to exceed six (6) months) for a specific job or relief work.

Section 3.  Employees Leaving and Returning to the Bargaining Unit

Inasmuch as Supervisors and employees in certain other jobs are specifically excluded from the Union, when an employee is promoted or transferred from a job covered by the bargaining unit to a supervisory or excluded job on a regular basis, he will cease to be covered by this Agreement; however, such employee may be returned by the Company, within six (6) months, to his former job classification or an equivalent job classification without loss of seniority accumulated before and after such promotion or transfer.  After six (6) months, he may be returned to his former job classification or an equivalent job classification without loss of seniority accumulated before such promotion or transfer.  This Section 3 is not applicable to employees temporarily performing supervisory or excluded jobs not covered by this Agreement.  During such temporary period of assignment, the employee maintains all rights conferred by the Working Agreement.  The employee's membership in the Union does not terminate and he continues to accumulate seniority during the assignment.  Temporary assignment to a supervisor or other excluded jobs will not be any longer than four (4) months in a twelve (12) month period unless mutually agreed upon between the Company and Union.

Regarding temporary assignments to excluded jobs, the Company will consider all employees that express interest in "Step-up" opportunities.  The Company will provide feedback to any employee not selected and will help by identifying areas of improvement.

Section 4.  Successorship

  The Company agrees that the adoption of this Agreement will be a condition of the sale, divestiture or transfer of any facility covered by this Agreement.  When the sale, divestiture or transfer is publicly disclosed, the Company will provide the Union with relevant information concerning such transaction upon request.

\*   \*   \*

## ARTICLE 3
## RIGHTS OF MANAGEMENT

  (a) Except as otherwise provided in this Agreement, the Company, in the exercise of its function of management, shall have the right to decide the policies, methods, safety rules, direction of employees, assignment of work, equipment to be used in the operation of the Company's business, and to determine the hours of work and schedules, the right to hire, discharge, suspend, discipline, promote, demote, and transfer employees, and to release employees because of lack of work or for other proper or legitimate reasons, subject, however to the employee's privilege of bringing a grievance as provided in this Agreement.  The enumeration of the above management prerogatives shall not be deemed to exclude other prerogatives not enumerated.

  (b) The Company shall have the right to assign or contract work to persons or organizations not represented by the Union.  This right is limited only to the extent that it shall not be exercised when such actions directly result in the layoff or discharge of any employee covered by this Agreement.  In the event of arbitration over the Company's exercise of the right set forth herein, the sole question for the arbitrator shall be whether the Company has violated the foregoing limitation.

## ARTICLE 4
## HIRING AND DISCHARGE

  (a) All new employees, except those hired for temporary or part-time jobs, shall be considered as on a probationary basis for a period of six (6) months in order that their worth, capability, and attitude toward general rules and regulations may be determined. During the probationary period the Company may lay off or dismiss any probationary employees and it shall have no obligation to rehire such probationary employees and no resort to the grievance procedure may be had because of such layoff, dismissal or failure to rehire.  Probationary employees shall have the right to be represented by the Union from date of employment.  In the case of such layoff or dismissal the Company will notify the Union in advance.

  (b) Persons hired for temporary or relief jobs shall not be subject to the terms and provisions of this Agreement.

  (c) Persons hired for part-time work shall not be subject to the terms and provisions of this Agreement.

## ARTICLE 5
## WORKING CONDITIONS

Section 7. Overtime Distribution

  (a) Overtime shall so far as is practicable and reasonable to do so, be equitably distributed according to job classification within the line of progression and a record of such overtime shall be kept up to date by the Company and posted for each line of progression every seven (7) days.

  (b) In no event shall the remedy for violation of Section 7(a) be pay for time not worked.

## ARTICLE 13
## CONCLUSION

Section 2. Coverage of Agreement

  (a) The parties agree that this contract incorporates their full and complete understanding and that any prior written or oral agreements or practices are superseded by the terms of this Agreement. The parties further agree that no such written or oral understandings or practices will be recognized in the future unless committed to writing and signed by the parties as a Supplement to this Agreement.

  (b) This Agreement shall govern the parties' entire relationship and shall be the sole source of any and all rights or claims which may be asserted in arbitration hereunder or otherwise.

  (c) The parties for the life of this Agreement hereby waive any rights to request to negotiate, or to negotiate or to bargain with respect to any matters contained in this Agreement except as specifically noted otherwise herein.

## The Facts

American Electric Power (AEP) is a holding company with various energy subsidiaries including the Cook Coal Terminal (CCT) in Illinois and the Mitchell Plant in West Virginia, a coal fired electricity generating plant. Employees at CCT are represented by United Mine Workers of America Local 2463. Employees at Mitchell are represented by Utility Workers Union of America Local 492.

In the summer of 2021 a fire occurred at CCT, disrupting operations there. At around the same time, Mitchell had been losing employees to retirement and health issues, but was projected to receive more than

the usual number of barge shipments of gypsum and limestone over the succeeding months. As Management at Mitchell pondered options, including increased use of contractors, Management at CCT arranged for employees from the CCT bargaining unit to be transferred to Mitchell. CCT Management selected the employees to be transferred, and eight CCT employees were transferred from CCT to Mitchell in August 2021 (and several more later), and continued to work at Mitchell until February 2022, when CCT was being brought back into operation, and the employees returned there. Other CCT employees were transferred to the Rockport Plant, but this is not involved in the current arbitration.

Mitchell supervision drafted a list of projected tasks for the CCT transferees and discussed it with CCT Management. The transferred employees were qualified to do these jobs.

The list of duties included the following:

> Repair tracks at gate 4
> Grease conveyor systems
> Clean all of the conveyor pans
> Clean and organize Tractor Shed and DTE Building
> Service equipment
> Unload lime, trona and urea
> Clean the ash pond
> Deckhand?
> Shove in on the coal piles
> Cover the limestone pile
> Mowing and trimming
> Snow removal
> Help operations with fueling space heaters
> Clean ditches and sumps around coal pile
> Routine environmental tasks
> Change rollers
> Yardman tasks
> Clean in the gypsum barn
> Clean the MCCs
> Clean and organize the C boxes

It appears that all the functions listed are routinely performed by Mitchell bargaining unit employees.

CCT employees at Mitchell performed many of the same tasks as bargaining unit employees, including deckhand work, shoveling coal, beltway work and minor maintenance. They worked "side by side" with bargaining unit employees. The transferred CCT employees were supervised at Mitchell by Mitchell supervisors.

The CCT employees working at Mitchell worked seven consecutive 12 hour days every two weeks, to allow them to return home during their off week. No Mitchell bargaining unit employees have such a schedule.

The CCT employees at Mitchell worked a total of 4887 straight time hours, 1976 overtime hours and 1047 double time hours. CCT employees were not included in the overtime equalization process under Article 5 Section 7 of the Local 492 collective bargaining agreement.

In August 2021 Mitchell Plant Manager Douglas Rosenberger informed UWUA Local 492 President Jason Wensel that employees from CCT would be brought in to work in the coal yard, but the Company did not offer to negotiate the terms of their employment at Mitchell.

The Company did negotiate terms of the transfer with UMWA Local 2463. Under the Memorandum of Understanding between CCT and Local 2463, employees who transferred were entitled to specified travel expenses. The MOU also provided:

> 4. All CCT employees that choose to travel shall be covered by the existing agreement between AEP Generating Company Cook Coal Terminal and International Union United Mine Workers of America and Local Union 2463 effective April 26, 2018.
>
> 7. An employee accepting to work at Mitchell or Rockport Plant does so with the understanding they will be under the supervision of the "local" plant management. They must follow any directive from local supervision and any issues must be reported to local supervision. The employee is expected to follow all local safety rules, policies and procedures. If a local safety rule, policy or procedure is in conflict with the existing agreement between AEP Generating Company Cook Coal Terminal and International Union United Mine Workers of America and Local Union 2463 effective April 26, 2018 this shall be brought to the attention of local supervision to then be discussed with CCT management.
>
> 9. If any job performance issue arise while an employee is assigned under this agreement CCT management will discuss it with local union leadership and CCT management will retain the right to refuse to allow said employee to travel under this agreement.

The Mitchell Plant has made extensive use of outside contractors. In 2021 the total contractor labor hours at Mitchell (not counting CCT employees' hours) was 203,724. Typically contractors perform specialized work such as belt line splicing, rebuilding the cooling tower, scaffolding, and removing bottom ash. Contractor employees are supervised by the contractors and not by Mitchell supervision. AEP negotiates the scope of work with the contractor involved, negotiates a price, and enters into a signed contract with the contractor. No such AEP-CCT contract or scope of work was created for the CCT employees transferred to Mitchell. AEP employees wear badges and white hard hats. Contractors have blue badges and different colored hard hats. The CCT employees used the same types of badges and hard hats as UWUA Local 492 bargaining unit employees.

But for the transfer of CCT employees, additional work at Mitchell, such as in connection with the additional barges, may have been assigned to bargaining unit employees or the Plant may have made use of more contract labor. The CCT employees were not brought in because of specialized skills or for a major project that bargaining unit employees were not capable of performing.

The Mitchell Plant is serviced by AEP employees in the Northern Regional Service Organization (NRSO) and the Southern Regional Service Organization (SRSO). NRSO employees are represented by UWUA Local 544. SRSO employees are represented by the UMWA. As I understand, it RSO employees are used primarily for outages at many locations throughout the country. Outage work is the primary function of RSO employees. During outages at Mitchell RSO employees work on turbines and fans. When not occupied on

outages, at least some RSO employees fill in at Mitchell, and some RSO employees are based at Mitchell when not occupied by outages elsewhere. Nine RSO employees are "Mitchell based." RSO employees have been utilized at Mitchell in this manner for at least 16 years. When working at Mitchell, NRSO and SRSO employees are supervised by Mitchell supervision. The wages and terms of employment for NRSO and SRSO employees are in keeping with their collective bargaining agreements rather than the Local 492 collective bargaining agreement.

In 2021 the number of RSO hours worked at Mitchell was 30,281.

No Mitchell bargaining unit employees were laid off or discharged as a consequence of the transfer of employees from CCT to Mitchell. Additional employees have been hired at Mitchell since the return of the CCT employees. In 2022 about 20 - 25 new employees have been hired, about 80 percent of whom are bargaining unit employees.

## Issue

The issue, as agreed to by the Parties, is: Did the Company violate the collective bargaining agreement by transferring AEP employees from the Cook Coal Terminal to the Company's Mitchell Plant in West Virginia, and if so what should be the remedy.

## Position of the Union

The Union notes that the agreement between AEP-CCT and UMWA Local 2463 was entered into without notice to or bargaining with UWUA Local 492. It avers that the workers from CCT "did the exact same work as the Local 492 members" but were not afforded the wages and benefits provided under the Local 492 collective bargaining agreement.

It submits that unlike the contractors utilized at the Mitchell Power Plant, the transfer of employees from CCT involved no scope of work, negotiation of price or even a contract, and Local Management was not even involved in the negotiations between AEP-CCT and UMWA Local 2463 for the transfer. The Union contends that since the Company did not include the CCT employees in the contractor hours tracked by the Kentucky Power VEROS system, the Company itself did not consider the transferred workers as contractor employees.

The Union argues that despite a standard and long standing recognition clause, AEP negotiated with a different Union that had bargaining rights at a different AEP facility to transfer ten employees into Local 492's bargaining unit and work side by side with Local 492 members, but with better shifts, wages and benefits than Local 492 members received. It argues that AEP-CCT does not operate the Mitchell Plant and UMWA Local 2463 has no legal authority to enter into an agreement covering production and maintenance work at Mitchell.

To the extent that the Company claims its actions were a permissible exercise of its right to contract out work, the Union maintains that the transaction violates the recognition clause and is not a legitimate instance of contracting out. It cites the testimony of Plant Manager Rosenberger that subcontracting is when an outside company is hired to work at the Mitchell Plant. It stresses his testimony that such a transaction

involves a contract with a scope of work provision and a negotiated price. It observes that contractors provide their own supervision.

The Union emphasizes that there was no contract between AEP-Kentucky Power and another company for the work performed.

In the instant case, the Union contends that AEP transferred its own employees from another facility after negotiating an agreement with a different Union who had no lawful bargaining rights at the Mitchell Plant. It asserts that the Company did not use its own system to track contractor hours for the CCT employees because they were not considered contractors.

It reasons that AEP-Kentucky Power did not contract with another employer to perform bargaining unit work but simply used AEP employees from another facility to do UWUA Local 492 bargaining unit work, and that such is not encompassed by the management rights provision in Article 3 of the collective bargaining agreement.

The Union distinguishes the NRSO employees in that these workers all worked at Mitchell originally, and there is a long established contractual relationship covering NRSO employees who work occasionally at the Mitchell plant.

It cites arbitration cases finding that a contractual recognition clause prohibits the assignment of bargaining unit work to outsiders. It insists that UWUA Local 492 bargaining unit members have exclusively performed the work done by transferred CCT employees, and that the Company held off hiring new employees into the bargaining unit because CCT employees were doing the work. It characterizes the failure to bargain with UWUA Local 492 as unlawful.

The Union urges that there was no change in the work , no economic necessity, and no reorganization or change in technology that might warrant the transfer of CCT employees.

The Union further argues that the Company's actions constitute an unfair labor practice as a unilateral action and a repudiation of the existing collective bargaining agreement. It cites National Labor Relations Board cases in support of its position that transfer of bargaining unit work to outsiders (including to a different Union) is a mandatory subject of bargaining.

It deems that UWUA Local 492 bargaining unit members lost nearly 8000 hours of work, including over 3000 overtime hours.

It asks that the grievance be sustained and that UWUA Local 492 members be made whole for economic losses suffered.

## Position of Management

The Company allocates to the Union the burden of proof of a contract violation, and it maintains that the Union has not satisfied its burden. It notes the arbitrator's limited authority to interpret but not change the provisions of the collective bargaining agreement.

It points to the zipper clause in Article 13 of the agreement and argues that since the collective bargaining agreement provides for the right to contract work, the grievance should be denied. It reasons that any claim must be based on contractual provisions restricting Management's right to make work assignments to persons not represented by the Union, and that the only restriction is that the assignment must not result in layoffs. It further applies the zipper clause to negate the Union's claim of any duty to bargain over the utilization of CCT employees.

The Employer observes that Management was already considering the use of outside contractors for anticipated increased coal deliveries when the fire at CCT occurred. It notes that there are contractor employees working at the Mitchell Plant every day, as well as RSO employees who routinely work at the Plant.

It relies in particular on the contracting provision of Article 3 Paragraph b. It contends that the right to contract is limited only to the extent that such results in layoffs, which has not occurred. It stresses the restriction on the arbitrator's authority set forth in this paragraph.

The Company points to the exclusion of temporary employees (as defined in Article 2 Section 2 (c)) under Article 4 Paragraph b, which it considers the CCT employees at Mitchell Plant to be. It insists that the CCT employees were assigned on a temporary basis and are not covered by the collective bargaining agreement. It denies that the classifications listed in the Wage Agreement established exclusive jurisdiction over such work. It notes that RSO employees have these same classifications and have worked at the Mitchell Plant for years.

It regards the Union's distinctions between CCT transferees and contractors as irrelevant. It submits that bargaining unit employees often work with employees represented by other Unions, including the RSO employees. It maintains that the agreement does not distinguish among "types" of contractors.

The Employer disputes the accusation that it has committed an unfair labor practice. It avers that there was no demand to negotiate by the Union, although the Union was notified of the transfer a week before the CCT employees began work at the Plant. It emphasizes the waiver of bargaining in Article 13 Section 2 (c). It deems that the CCT employees were either temporary employees or persons to whom the Company had the right to assign or contract work. It urges that if the collective bargaining agreement authorizes its action, there is no unfair labor practice.

The Company concludes that the decision to utilize CCT employees, who otherwise would have been laid off themselves, was neither unreasonable nor arbitrary or capricious, and did not erode the UWUA Local 492 bargaining unit.

It asks that the grievance be denied.

## Analysis and Conclusions

The CCT employees who worked at the Mitchell Plant were indistinguishable from the Mitchell bargaining unit employees. A hypothetical man from Mars would not have been able to determine whether a particular individual was a Mitchell employee or a CCT employee. They performed the same tasks and worked "side by side." The CCT employees wore badges and hard hats identical to those worn by Mitchell employees,

unlike employees of independent contractors. The CCT employees did not have unique skills, nor did they perform duties different from those carried out by bargaining unit employees. The same supervisors told individuals from both groups what to do. The only distinctions between the two groups, which would not have been obvious to the man from Mars, was that the CCT employees worked a different schedule of one week on, one week off, and that they were compensated differently.

Given the identity in work location, work functions, supervision, badges and hard hats, the employees from CCT fit squarely within the contractual definition of the bargaining unit: "All production and maintenance employees, including performance and custodian employees at the Company's Mitchell Power Plant located in Cresap, West Virginia." The CCT transferees were performing production and maintenance work "at" the Mitchell Power Plant. The contract makes clear that "all" such individuals, not just some of them, are included in the contractual bargaining unit.

The fact that the CCT employees may have simultaneously been members of a different bargaining unit, represented by the UMWA, does not remove them from the unit represented by the UWUA. A person who "moonlights" at a second job can be in two different bargaining units, and represented by two different unions.

The Company's failure to apply the contract to some individuals who are incorporated in the bargaining unit necessarily violates the recognition clause of the agreement as well as specific provisions dealing with the wages, benefits and other terms and conditions of employment that are to be applied to bargaining unit employees, unless some other provision of the agreement excuses the Company's action.

In this regard the Company points to Article 3 (b) of the agreement acknowledging its right to utilize contractors "not represented by the Union." The CCT transferees, however, cannot be deemed to be independent contractors or employees of independent contractors. The hypothetical man from Mars could readily distinguish contractor employees from Mitchell bargaining unit employees: they wore different badges and hard hats, they reported to different supervision. For the most part the contractor employees had unique skills and worked on special projects, as distinguished from the day to day work performed by individuals in the bargaining unit.

Most importantly, the individuals from CCT were not independent contractors, or employees of independent contractors, because there was no contract. A company does not contract with itself. Indeed, there were none of the characteristics of the typical arrangement between the Mitchell Plant and an outside independent contractor: no definition of a scope of work covered, no provision for pricing, and indeed no contract document.

The Employer cites the RSO employees, who at least sometimes perform the same work as bargaining unit employees without themselves being treated as included within the bargaining unit. The key distinction in this regard is that the Union consented to the exclusion of the RSO employees from the bargaining unit, but it did not consent to the exclusion of the CCT employees.

Finally, the Company would exclude the CCT transferees from contractual coverage pursuant to Article 4 (b) of the collective bargaining agreement as temporary employees. While Article 4 (b) does exclude temporary employees from the terms or provisions of the agreement, the individuals from CCT do not meet the contractual definition of temporary employees. Article 2 Section 2 (c) defines temporary employees: "Temporary employees are those employees hired for full-time employment for a temporary period (not

normally to exceed six (6) months) for a specific job or relief work." The group from CCT was brought on for an indefinite period – until CCT was back in operation after the fire. Although in fact they remained at Mitchell for about six months, there is no indication at the time when they were transferred that their tenure at Mitchell would be limited to six months if the repairs at CCT took longer than that to accomplish.

Furthermore, the type of assignment envisioned under the contract for temporary employees ("a specific job or relief work") suggests the same type of arrangement as applies to contractors, namely a particular project as distinguished from the generic, run of the mill tasks performed by the CCT transferees (and the regular employees as well).

Based on the above, I conclude that the Company violated the agreement by failing to apply it to the individuals brought in from CCT to work at the Mitchell Power Plant.

The foregoing is the easy part of this decision. The hard part is fashioning a remedy. The purpose of a remedy is to place those who have been harmed by a contractual violation in the same circumstances they would have been in, but for the violation.

In the current case, at least three groups of potential "victims" can be identified. First are the CCT employees themselves who apparently would have received different compensation under the UWUA collective bargaining agreement than under the UMWA agreement in effect at CCT. A second group potentially entitled to a make whole remedy comprises the bargaining unit employees at the Mitchell Plant, who may have received greater overtime opportunities if employees from CCT had not been brought to the Mitchell Plant, or alternatively if the overtime allocated to the CCT employees had been subjected to the contractual overtime equalization process. Yet a third group of individuals who were potentially harmed by the Company's action are the recent hires, who may have been offered employment sooner if the CCT employees had not been brought to the Mitchell Plant.

On the present record it is impossible to evaluate the most likely scenario, and even with additional evidence the projection of what would have happened may involve speculation, although the fact that the answer may be less than clear does not relieve the responsibility of using best efforts to seek an answer. Under these circumstances the best course, in my view, is to return the case to the Parties for their informed discussion on the matter of remedy, while retaining jurisdiction against the possibility that they may be unable to agree. I commend to the Parties my sense that this is a case that calls for compromise and rough justice, rather than attempting a detailed reconstruction of what would have happened.

## Award

The grievance is sustained. The case is returned to the Parties for them to attempt to fashion a remedy. I shall retain jurisdiction for further proceedings, including the taking of additional evidence and issuance of a Supplemental Award, upon motion from either Party stating that the Parties have reached impasse over the remedy issue.

Issued September 4, 2022

*Matthew M Franckiewicz*